# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>ALEJANDRO ACOSTA,<br><br>  Defendant. | No. 07-CR-70-CJW-MAR<br><br>**MEMORANDUM OPINION AND ORDER TO BE FILED UNDER SEAL** |

## I.  INTRODUCTION

This matter is before the Court on defendant's Amended Motion for Compassionate Release filed on July 28, 2020. (Docs. 246 & 247). On August 3, 2020, the government timely filed a resistance. (Doc. 248). On August 10, 2020, defendant timely filed a reply. (Doc. 250). For the following reasons, the Court **denies** defendant's motion.

## II.  RELEVANT BACKGROUND

From January through August of 2007, defendant conspired with at least five others to distribute 100 kilograms or more of marijuana. (Doc. 188, at 7). In total, defendant stipulated that he was involved with the distribution of 700 to 1,000 kilograms of marijuana. (*Id.*). The distribution scheme involved armed drivers transporting marijuana from Mexico to Cedar Rapids, Iowa and Ohio by vehicle. (*Id.*, at 7–8). Defendant directed shipments of large quantities of marijuana to Cedar Rapids, among other places. (*Id.*, at 11). On two occasions, defendant personally transported marijuana to Cedar Rapids. (*Id.*). Defendant also housed drug traffickers at one of his residences which he paid for with funds he received from a high-level Jamaican marijuana trafficker

he knew as Papa. (*Id.*, at 9 n.1). On August 2, 2007, some of defendant's co-conspirators were arrested outside an IHOP in Cedar Rapids while defendant was inside paying their lunch bill. (*Id.*, at 10). Defendant exited the restaurant through a back door and was not arrested until United States Marshals located him at his residence in Tolleson, Arizona on August 31, 2007. (*Id.*). At that time, a firearm was found in defendant's dresser drawer. (*Id.*). Defendant's wife and children lived in the same residence. (*Id.*). Defendant estimated that he earned $60,000 from selling marijuana in Cedar Rapids and an additional $60,000 for assisting Papa. (*Id.*, at 11).

On August 8, 2007, a grand jury issued an Indictment charging defendant with one count of conspiracy to distribute marijuana in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846 and one count of possession with intent to distribute marijuana in violation of the same sections. (Doc. 1, at 1–2). On September 25, 2007, a grand jury issued a Superseding Indictment additionally charging defendant with one count of possession of firearms in connection with drug trafficking in violation of Title 18, United States Code, Section 924(c). (Doc. 75, at 3). On October 22, 2007, defendant plead not guilty and was released. (Doc. 91). On December 4, 2007, defendant changed his plea to guilty on the conspiracy ("Count 1") and firearm ("Count 3") charges. (Doc. 111). On December 19, 2007, the Court accepted defendant's plea. (Doc. 113).

Defendant's presentence investigation report indicates that he was, at that time, 33 years old and residing in Arizona. (Doc. 188, at 2). Defendant reported that no one in his immediate family abused drugs or alcohol and that only one of his siblings had any criminal history. (*Id.*, at 24–25). He was born in Nogales, Sonora, Mexico. (*Id.*, at 24). He advised he had a good relationship with his parents and siblings. (*Id.*). Defendant graduated high school ranked 104th out of 108 students. (*Id.*, at 28). Defendant had been unemployed since 2005 but was previously employed as a technician

and a brick tender. (*Id.*, at 29). Defendant had two children with his wife, two stepchildren, and a child from a previous relationship. (*Id.*, at 25–26). Defendant suffered from degenerative disc disease, high blood pressure, type II diabetes, glaucoma with vision loss, and partial hearing loss. (*Id.*, at 27). Defendant reported that he had two anxiety panic attacks in the past but otherwise had no mental health issues. (*Id.*). Defendant reported that he began using alcohol and marijuana as a teenager and, although he continued to use marijuana biweekly, he stopped using alcohol at age 23. (*Id.*).

Defendant's criminal history was significant. His convictions included disorderly conduct, driving without a license twice, supplying alcohol to minors three times, public intoxication, driving without registration, harassment, domestic abuse assault, possession of marijuana, knowingly displaying fictitious plates, and endangering the life or health of a minor. (*Id.*, at 16–22). His harassment conviction at age 24 involved him and others threatening a teenage girl and a male via phone and following them in their vehicles. (*Id.*, at 18). His domestic abuse assault conviction, also at age 24, involved assaulting his girlfriend by punching her, biting her nose, and displaying a knife. (*Id.*, at 19).[1] His endangering the life or health of a minor conviction involved him disciplining his stepson with a wooden paddle and causing bruising to the child's legs. (*Id.*, at 22). Defendant's probation had been revoked once. (*Id.*, at 17). Prior to this offense, his longest single period of incarceration was approximately a month. (*Id.*, at 19).

On September 25, 2008, the Court sentenced defendant. (Doc. 186). Defendant was in criminal history category III with a total offense level of 34, yielding an advisory guideline range of imprisonment of 188 to 235 months. (Doc. 188, at 32). Defendant's

---

[1] At the time of sentencing, defendant had another pending charge for domestic abuse assault causing injury from that same year. (Doc. 188, at 23). On that occasion, defendant "threw" a woman down the steps of a fire escape and grabbed her in a manner that left marks. (*Id.*). Defendant was subsequently convicted of this charge in 2008. (Doc. 248-3).

3

guideline range for supervised release following incarceration was four to five years on Count 1 and three to five years on Count 3. (*Id.*, at 33). The Court ultimately sentenced defendant to 105 months' imprisonment followed by five years on supervised release on both Counts 1 and 3 to run concurrently. (Doc. 187). On February 10, 2011, the Court reduced defendant's sentence to 79 months imprisonment. (Doc. 193).

On July 24, 2014, defendant began his term of supervised release in the District of Arizona. (Doc. 216, at 2). His jurisdiction remained in the Northern District of Iowa. (*Id.*). On February 16, 2015, defendant failed to attend a meeting with Immigration and Customs Enforcement ("ICE"). (*Id.*). The United States Probation Office ("USPO") made "numerous" unsuccessful attempts to contact defendant from February 27, 2015, to March 19, 2015. (*Id.*). On March 19, 2015, defendant contacted the USPO and advised that he did not attend the ICE meeting because he did not want to go into ICE custody and be separated from his family. (*Id.*). Defendant further advised that he had relocated his family to Mexico and was maintaining a residence there. (*Id.*). The USPO was unable to verify defendant's whereabouts. (*Id.*).

Defendant was eventually arrested more than four years later in Arizona on August 30, 2019. (Doc. 220, at 2). On September 24, 2019, the Court revoked defendant's supervised release for failure to notify the USPO of a residence change and failure to report to his probation officer. (Docs. 220 & 228). The Court sentenced defendant to 24 months' imprisonment followed by five years on supervised release. (Doc. 229). On October 8, 2019, defendant timely appealed his revocation sentence. (Doc. 230).

On July 1, 2020, defendant filed a pro se motion for compassionate release. (Doc. 237). On July 15, 2020, defendant filed a supplement to his pro se motion. (Doc. 240). On July 20, 2020, the Eighth Circuit Court of Appeals affirmed defendant's revocation sentence. (Doc. 242). After the Court appointed defendant counsel (Doc. 238), he filed his Amended Motion for Compassionate Release now before the Court on July 28, 2020

4

(Docs. 246 & 247). Defendant is currently incarcerated at Victorville Medium I FCI with a projected release date of May 13, 2021. *Find an Inmate*, BOP, https://www.bop.gov/inmateloc/.

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the USSG section discussing compassionate release. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides

extraordinary and compelling reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

## IV. DISCUSSION

### A. *Exhaustion of Administrative Remedies*

Section 3582(c)(1)(A) states a court may reduce a term of imprisonment after the defendant exhausts all administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" This Court has held that defendants are not required to administratively appeal a warden's denial and may fulfill the exhaustion requirement of

6

Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion in the courts. *See Burnside*, 2020 WL 3443944, at *4–7.

On May 6, 2020, defendant submitted a request for release to the warden of his facility. (Doc. 247-1, at 1–3). On July 20, 2020, the warden denied his request. (*Id.*, at 4–5). Because 30 days have elapsed since defendant submitted his request to the warden, the Court finds he has fulfilled the exhaustion requirement of Section 3582(c)(1)(A).

### B. *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because his type II diabetes, essential hypertension, hyperlipidemia, and weight put him at a high risk of severe complications and death if exposed to COVID-19. (Doc. 247, at 8–16). Defendant highlights that he lacked access to medication for his diabetes on at least one occasion, has gained weight while incarcerated, and has often been in hypertension stages 1 and 2. (*Id.*). Victorville Medium I FCI is among the BOP facilities hardest stricken by COVID-19, with more than 100 active inmate cases, seven active staff cases, and 28 recovered inmate cases. *COVID-19*, BOP, https://www.bop.gov/-coronavirus/. At this time, no inmates at the facility have died from COVID-19. *Id.*

The presence of COVID-19 at a defendant's specific facility or within the BOP generally can constitute an extraordinary and compelling reason for compassionate release if the defendant is particularly susceptible to COVID-19 due to their age or underlying health conditions. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases); *see also People Who are at Increased Risk for Severe Illness*, CDC, https://www.cdc.-gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html. The Centers for Disease Control and Prevention ("CDC") recognizes that persons with type II diabetes are at an increased risk of suffering severe complications if exposed to COVID-19. *People with Certain Medical Conditions*, CDC, https://www.cdc.gov-

/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?-CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%-2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#diabetes. The CDC states that persons with a body mass index ("BMI") in excess of 30 and persons with pulmonary hypertension are also at an increased risk. *Id*. Persons with essential hypertension "may" be at an increased risk. *Id*. The CDC does not list hyperlipidemia or high cholesterol as actually or potentially increasing a person's susceptibility to COVID-19. *Id*.

Defendant has a 20-year history of type II diabetes. (Doc. 247–1, at 7). Defendant currently takes several prescriptions for his diabetes. (*Id.*, at 9). He is not insulin dependent. (*Id.*, at 19). He has taken medications "on and off" for his diabetes over the years. (*Id.*). In February and March of 2020, defendant's medical records indicate he "ha[d] no" medications for approximately the last three months. (*Id.*, at 7, 12). It is not clear whether defendant did not have access to his medications or was not taking them. In any event, he had "no specific complaint" about his diabetes in February 2020 and refused to take insulin in March 2020, although defendant notes he refuses all insulin injections due to his fear of COVID-19. (*Id.*); *see also* (Doc. 240, at 1). There is no indication in the record that defendant's diabetes is uncontrolled or problematic. Thus, although his type II diabetes increases his susceptibility to COVID-19, it does not appear that his diabetes is particularly serious.

Defendant cites, among other cases, this Court's prior Order in *United States v. Noye*, No. 19-CR-78 CJW-MAR, 2020 WL 4207553 (N.D. Iowa July 22, 2020), in support of his position that many courts have held type II diabetes can warrant release either on its own or in combination with other health conditions. (Doc. 247, at 13). In *Noye*, the defendant's type I diabetes was far more serious than defendant's type II diabetes here. *See* 2020 WL 4207553, at *4 (noting the defendant had brittle diabetes and experienced drastic swings in his blood sugar levels). Thus, even though type I

8

diabetes is only regarded as a potential risk for increased complications amid the pandemic, the Court found the defendant's type I diabetes and other minor conditions marginally constituted an extraordinary and compelling reason for release. *Id.*, at *4–5. In short, although the Court agrees with defendant that diabetes alone or in concert with other conditions may warrant release under certain circumstances, those circumstances do not exist here. Unlike *Noye*, defendant's type II diabetes appears to be well-controlled and stable. Thus, although his condition is significant, it does not substantially increase his risk amid the pandemic such that it alone warrants release.

Defendant's other cited conditions also do not appear to be particularly serious and, even in combination with type II diabetes, do not warrant release. He is only 45 years old. (Doc. 188, at 2). Defendant "[a]ppears [o]bese," has gained weight in recent years, and his BMI was recently recorded as 29.8, just below the CDC's 30 BMI risk category. *See* (Doc. 247–1, at 9); *see also* (Doc. 188, at 2) (noting defendant's height and weight at the time of sentencing). Thus, although his weight is significant, it at best minimally increases his risk. Although he has a long history of hypertension, he currently receives medication for this condition. (Doc. 247–1, at 9). Moreover, this condition is not known to inherently increase his susceptibility to COVID-19. Further, the CDC, at this time, does not recognize hyperlipidemia or high cholesterol as increasing a person's risk of severe complications if exposed to COVID-19. In short, although defendant has some conditions which increase his susceptibility to COVID-19, such conditions do not individually or collectively constitute an extraordinary and compelling reason for release given that they are relatively minor and well-controlled. Although defendant is at a facility with a substantial amount of active COVID-19 cases, it does not appear his health conditions place him at anything more than a slightly elevated risk.

9

Thus, the Court finds defendant has not presented an extraordinary and compelling reason for release. The Court will, however, consider the Section 3553(a) factors independently as if defendant had presented a sufficient reason for release.

### C. *Section 3553(a) Factors and Danger to Community*

Defendant argues the Section 3553(a) factors favor release. (Doc. 247, at 17–18). Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

Defendant argues his offense is less serious because it involved marijuana and not heroin or methamphetamine. (Doc. 247, at 17). The Court declines to make distinctions between illegal substances. Defendant was deeply involved in high-level, international armed marijuana distribution. Given that he was unemployed, it appears he supported himself and his family by dealing drugs. Defendant himself is only a minimal user of marijuana. After serving his sentence and being on supervised release for only about seven months, defendant moved his family out of the United States with the explicit purpose of evading law enforcement officers. His whereabouts were unknown for more than four years. This conduct, along with his earlier flight from the IHOP and escape

10

conviction (Doc. 248–2), shows defendant has a pattern of fleeing from the law.[2] Despite his flight from federal supervision, he reentered the country and was re-apprehended. He was disciplined while in prison less than a month ago for phone abuse. (Doc. 247–1, at 74). His participation in BOP programming has been minimal. (*Id.*, at 75). Nothing in his background explains or mitigates his voluntary decision to involve himself in crime. Defendant's conduct here and his criminal history both show a pattern of disrespect for the law.

Defendant requests that he be released back to Arizona to live with his fiancée and several children, including multiple toddlers and an infant. (*Id.*, at 78). His release plan presents an obvious risk of repeated criminal conduct. Further, defendant still has approximately nine months of his two-year sentence left to serve. Defendant's violations while on release show he has not been adequately deterred and that he still presents a significant danger to the public. Thus, the Court finds the Section 3553(a) factors strongly weigh against release.

---

[2] Defendant's escape conviction was pending at the time of sentencing (Doc. 188, at 23), but records indicate he was convicted on this charge in 2008 (Doc. 248–2). The presentence investigation report indicates defendant was released from jail to go to work and failed to return. (Doc. 188, at 23).

## V. CONCLUSION

For these reasons, defendant's Amended Motion for Compassionate Release (Doc. 246) is **denied**.[3] Defendant must serve the remainder of his term of imprisonment as previously directed. (Doc. 229).

**IT IS SO ORDERED** this 17th day of August, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

---

[3] To the extent defendant's pro se motion for compassionate release (Docs. 237 & 240) is not superseded by his current motion, the Court **denies** it as duplicative.